UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| STARNET INTERNATIONAL AMC INC., dba ALL CHEER INTERNATIONAL LIMITED and KERRY INTERNATIONAL,<br><br>Plaintiff,<br><br>v.<br><br>MOUSA KAFASH dba BAPAZ GARMENTS, et al.,<br><br>Defendant. | Case No.: 09-CV-04301-LHK<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

On September 16, 2009, Plaintiff Starnet International AMC Inc. filed its complaint against Defendant Mousa Kafash dba Bapaz Garments. Dkt. No. 1. In its complaint, Starnet alleged that Mousa Kafash ordered $132,298.32 in goods from Starnet, that Starnet delivered the goods to Mousa Kafash, that Mousa Kafash received the goods, and that Mousa Kafash failed to pay for the goods. Based on these allegations, Starnet brought five causes of action: (1) Open Book Account; (2) Account Stated; (3) Reasonable Value of Goods Sold and Delivered; (4) Intentional Misrepresentation; and (5) Negligent Misrepresentation. On November 29, 2010, Mousa Kafash moved for summary judgment on all five causes of action, Dkt. No. 56, and the Court granted Mousa Kafash's motion as to Starnet's fourth and fifth causes of action, Dkt. No. 64. A Court trial on Starnet's three remaining causes of action was held on January 24, 2011.

Starnet's theory at trial followed the allegations in its complaint. Starnet's Chief Financial Officer Kurt Miller testified that Starnet's business records show that Mousa Kafash dba Bapaz Garments ordered, received, and failed to pay $132,298.32 for fabrics. Beyond the value of the goods allegedly sent to Mousa Kafash, Starnet seeks $27,329.57 in pre-judgment interest, $1,000 in attorney's fees, and $454.00 in recoverable court costs. Dkt. No. 76.

Mousa Kafash was not present at the trial. Mousa Kafash's sole witness at trial was his son, Peter Kafash. According to the testimony of Peter Kafash, Mousa Kafash is the CEO of Bapaz Garments Corp. Peter Kafash testified that Mousa Kafash never did business with Starnet in an individual capacity. Rather, Peter testified that he, Peter Kafash, ordered goods from Starnet on behalf of Bapaz Garments Corp. In other words, Peter Kafash claimed that any claims for unpaid goods should be directed at Bapaz Garments Corp., not Mousa Kafash. Furthermore, Peter testified that Bapaz Garments Corp. had received only $69,673.32 in goods and that Bapaz Garments Corp. had already paid for those goods.

At the close of the trial, the case was submitted for decision. Pursuant to Federal Rule of Civil Procedure 52, the Court finds and concludes as follows.

## FINDINGS OF FACT

Starnet and Mousa Kafash raised the following factual disputes during trial: (1) With whom did Starnet transact business between January 1, 2008 and December 31, 2008; (2) What goods did Starnet ship to Mousa Kafash dba Bapaz Garments; and (3) What payments, if any, did Mousa Kafash dba Bapaz Garments make to Starnet for the goods received?

### A. Background

Starnet Internation AMC Inc. aka Starnet International AMC Inc. ("Starnet") is a California corporation organized in 2003 and is in the business of distributing fabrics. In 2004, Starnet purchased the distribution rights of Kerry Fabrics, a Chinese manufacturing company. In May or June of 2008, Starnet purchased the distribution rights of All Cheer International Limited, a

1    manufacturing company in Hong Kong.  Starnet still does business under the Kerry Fabrics and All
2    Cheer International Limited names.[1]

3    Starnet maintains a customer file for each of its buyers in the regular course of business.  A
4    buyer's file contains documents related to the buyer's interactions with Starnet, including purchase
5    orders, e-mails, invoices, and shipping documents.  Starnet keeps these files in its company office
6    and sorts them alphabetically by customer name.

7    At the end of each month, Starnet sends out a statement of account to its customers.  The
8    statement of account summarizes what Starnet believes the customer owes Starnet.  Customers can
9    dispute the amount, and Miller conceded that the amount shown on a statement of account is not
10   always correct.

11   Starnet maintains different payment policies for its customers depending on the situation.
12   Sometimes Starnet requires a deposit.  Sometimes it requires customers to pay in advance.  One of
13   Starnet's consistent practices, however, is that when Starnet does business with a corporation,
14   Starnet requires a personal guarantee.

15   Kurt Miller is currently the Chief Financial Officer of Starnet.  He began work as Starnet's
16   CFO in July 2008.  He handles the financial needs of Starnet, Kerry Fabrics, and All Cheer.
17   Miller's duties include overseeing the accounting and collection activity.

18   Bapaz Garments Corp., a textile importer for garment manufacturers, is a New York
19   corporation organized in 2004.  According to Peter Kafash, Mousa Kafash is the founder and CEO
20   of Bapaz Garments Corp.  According to Peter Kafash, Peter Kafash runs the day to day operations
21   of Bapaz Garments Corp. and places all of Bapaz Garments Corp.'s purchasing orders.

22   **B.  Burden of Proof**

23   As this is a diversity action, California law governs which party bears the burden of proof.
24   *See Robinson, Leatham & Nelson, Inc. v. Nelson*, 109 F.3d 1388, 1391 (9th Cir. 1997) (citing *Erie*
25   *R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938)).  In California, "[a]s a
26   general rule, the 'party desiring relief' bears the burden of proof by a preponderance of the

---

[1] References to "Starnet" in the Court's Findings of Fact and Conclusions of Law refer to all of Starnet's operating businesses.

evidence." *Aguilar v. Atl. Richfield Co.*, 25 Cal. 4th 826, 861, 107 Cal. Rptr. 2d 841, 24 P.3d 493 (2001) (citation omitted); *see also* CAL. EVID. CODE § 500 ("Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting."). Starnet is the moving party and thus bears the burden of proof on any of the facts in contention.

### C. With Whom Did Starnet Transact Business in 2008?

The most contested point at trial was whether Starnet did business with Mousa Kafash dba Bapaz Garments or with Bapaz Garments Corp.

Starnet maintained that it always did business with Mousa Kafash dba Bapaz Garments. According to Miller, Starnet's account for Bapaz Garments was set up as an individual, not a corporate, account. Miller testified that the Bapaz Garments account file did not contain a personal guarantee, which Starnet always requires of corporate customers, or any other documents indicating that Bapaz Garments was a corporation. Miller also testified that he did not personally learn that Bapaz Garments was a corporation until after Starnet filed the instant lawsuit.

Mousa Kafash did not appear at trial. Peter Kafash maintained at trial that only Bapaz Garments Corp. ever did business with Starnet. Peter Kafash testified that Bapaz Garments Corp. started doing business with All Cheer International Limited in 2007 and always did so as a corporation. Invoices submitted by Peter Kafash show that Bapaz Garments Corp. purchased thousands of dollars in goods from All Cheer International Limited in 2007 in just a few months time. *See* D.'s Exs. 206, 207, 208. Peter Kafash further testified that even after Starnet purchased All Cheer International Limited in 2008, he continued to communicate with the same people at All Cheer and Kerry Fabric and continued to do business with them as a corporation. Moreover, Peter Kafash testified that Mousa Kafash speaks little English and does not purchase goods for Bapaz Garments Corp.

The Court finds that the facts are slightly more complicated than either side represents. Peter Kafash's testimony that he always did business with All Cheer International Limited as a corporation is undercut by the three purchase orders included in Defendant's exhibits. D.'s Exs.

200, 201, 202.² Starnet's customers prepare purchase orders and send them to Starnet in order to purchase goods from Starnet. Thus, a customer controls how its name appears on a purchase order. None of the purchase orders contained in Defendant's exhibits, however, lists a purchaser named Bapaz Garments Corp. *See id.* Rather, all three list the buyer's name as "Bapaz Garments." *See id.* By not attaching "Corp." to the end of the corporation's name, whoever prepared the purchase orders left it unclear whether Bapaz Garments was a corporation, a sole proprietorship, or some other business form. This supports Miller's testimony that Starnet was not aware that Bapaz Garments was a corporation. Further supporting Miller's testimony is the fact that all of the invoices that Starnet produced for the Mousa Kafash dba Bapaz Garments account identify the customer as Bapaz Garments, not Bapaz Garments Corp. *See* P.'s Exs. 4, 5, 6, 11, 17. From this evidence, the Court finds that Starnet was not aware that Bapaz Garments was a corporation.³

Even though the Court finds that Starnet believed Bapaz Garments to be a sole proprietorship, it is unclear why Starnet believed that it was doing business with Mousa Kafash. Starnet did not call any witness who actually spoke with Mousa Kafash during the purchasing process.⁴ Moreover, Starnet did not produce any purchasing order or invoice listing Mousa Kafash's name. The only document admitted into evidence that names Mousa Kafash is a Statement of Account, dated December 31, 2008, that Miller testified was in the account file for Mousa Kafash dba Bapaz Garments. *See* P.'s Ex. 7. Presumably, the presence of Mousa Kafash's name on the Statement of Account is a direct result of the fact that the account was created in his name. Starnet, however, produced no evidence at trial explaining why Starnet put Mousa Kafash's name on the account in the first place. Miller, Starnet's only witness, testified at trial that the Mousa Kafash dba Bapaz Garments account was created before he began at Starnet. Furthermore, the only evidence produced of any individual communicating with Starnet regarding purchasing actually supports Peter Kafash's testimony that he, not Mousa Kafash, did the ordering for Bapaz

---

² Plaintiff's exhibits also include copies of these three purchase orders. P.'s Exs. 1, 2, 3.
³ Even though Bapaz Garments Corp. did business with All Cheer International Limited as a corporation, *see* D.'s Exs. 206, 207, 208, this occurred before Starnet purchased All Cheer International Limited's distribution rights.
⁴ Miller testified that he spoke with Mousa Kafash during collection activity. Miller claimed that Mousa Kafash faxed him several documents, *see* P.'s Exs. 19, 20, 21, 22, 23, in response to their conversation.

5

Garments. One of Plaintiff's exhibits is an e-mail sent to Hawell, whom Miller testified is a salesman for Starnet, at hawellchan@yahoo.com.cn from someone named Peter at pkafash@aol.com. *See* P.'s Ex. 15.[5]

Based on this evidence, the Court finds that even though Starnet was unaware that Bapaz Garments was a corporation, Starnet has failed to meet its burden to prove by a preponderance of the evidence that Mousa Kafash ordered goods from Starnet either on behalf of himself or on behalf of Bapaz Garments Corp.

### D. What Goods Did Bapaz Garments Receive from Starnet?

Starnet claimed at trial that Mousa Kafash is liable for the balance shown on a December 31, 2008 Statement of Account: $132,298.32. *See* P.'s Ex. 7.[6] Even though Miller admitted that some of the numbers on the Statement of Account are not correct, Miller stood by the final total. According to Miller, the $132,298.32 total comes from adding the totals from three invoices, Proform Invoice No. K-100567, Proform Invoice No. K-100568, and Commercial Invoice No. K-100567/568, and subtracting a credit of $3,535.00. Miller maintained that Starnet shipped to a customer it believed to be Mousa Kafash dba Bapaz Garments all of the goods shown on those three invoices.

Peter Kafash testified that the only goods that Bapaz Garments Corp. received from Starnet were those listed on Commercial Invoice No. K-100567/568. *See* P.'s Ex. 6. Based on this assertion, he claimed that Bapaz Garments only owed Starnet $69,673.32, the amount shown on Commercial Invoice No. K-100567/568.

To resolve the parties' dispute, it is necessary to understand the process that Starnet uses to receive and fulfill a buyer's order. Both parties agreed at trial that to order goods from Starnet, buyers must first open negotiations by sending Starnet a "purchase order." *See e.g.*, P.'s Exs. 1, 2, 3. On the purchase order, the buyer details the type and quantity of fabric that the buyer wants.

---

[5] Plaintiff's Exhibit 22 does have a signature above a line labeled "Mousa Kafash." That document, however, is a communication between Bapaz Garments Corp. and Capital One Bank.
[6] Miller testified that Starnet sent Bapaz Garments this Statement of Account. Peter Kafash testified that he opens all mail addressed to Bapaz Garments and that he did not see the Statement of Account until after the start of litigation. On cross-examination, Miller had no explanation for the presence of the words "DocuCom PDF Trial" appearing across the document. The Court finds it doubtful, given the appearance of the document, that Starnet would have sent it to a customer.

1  Price is not specified on the purchase order.  Eventually, the two sides agree on the terms of the
2  bargain, and Starnet delivers to the buyer a specified amount of fabric at a specified price.  During
3  this process, Starnet utilizes two different types of invoices to share information with the buyer.
4  One is called a "proform invoice," and the other is called a "commercial invoice."  Both types of
5  invoices contain the same basic categories of information.  For example, each has a space for
6  Starnet to list: (1) a description of goods; (2) the quantity in yards; (3) the price per yard; and
7  (4) the total price.  The headings for these two types of documents look, in simplified terms, as
8  follows:[7]

## ALL CHEER IINTERNATIONAL LIMITED

COMMERCIAL INVOICE        INV.NO: K-{######}

DATE: {MONTH,DAY,YEAR}

TO: BAPAZ GARMENTS        SHIP DATE:{YYYY/MM/DD}

VESSEL NAME:{XXXX}

PAYMENT BY TT

FROM: SHANGHAI        TO: {DESTINATION}

| SHIPPING MARKS | DESCRIPTION OF GOODS | QUANTITY (YDS) | UNIT PRICE | TOTAL |
|---|---|---|---|---|
|  | {DESCRIPTION OF FABRIC} {COLOR} | {####} | USD {#.##} | USD {##,###} |
|  | TOTAL | {####} |  | USD {##,###} |
|  |  |  | DEPOSIT | USD -{##,###} |
|  |  | ({###} PIECES) |  | USD {##,###} |
|  | {INFORMATION OMITTED} |  |  |  |

---

[7] Information that varies from invoice to invoice is contained in brackets.

| ALL CHEER IINTERNATIONAL LIMITED |||||
|---|---|---|---|---|
| PROFORM INVOICE     NO: K-{######} <br>     DATE: {MONTH,DAY,YEAR} <br> TO: BAPAZ GARMENTS <br><br>     PAYMENT 20% DEPOSIT <br> FROM: SHANGHAI |||||
| SHIPPING MARKS | DESCRIPTION OF GOODS | QUANTITY (YDS) | UNIT PRICE | TOTAL |
|  | {DESCRIPTION OF FABRIC} <br><br> <br><br> TOTAL <br><br> <br> {INFORMATION OMITTED} | {COLOR}: {####} <br><br><br> {####} | USD {#.##} | USD {##,###} <br><br><br> USD {##,###} |

Both parties conceded at trial that a commercial invoice is created and delivered to a customer when the goods listed on the commercial invoice are shipped to the buyer. Thus, both parties agree that a buyer owes Starnet the total price listed on a commercial invoice. The parties disagreed, however, over whether a proform invoice represents an actual shipment of goods or is simply a preliminary statement that is superseded by a commercial invoice. If a preliminary invoice does memorialize an actual, independent shipment of goods, then a buyer owes Starnet the total price listed on a proform invoice. If it does not, a buyer owes only the total price listed on a commercial invoice.

Miller testified at trial that a proform invoice does represent a shipment of goods. According to Miller, Starnet creates a proform invoice when it makes a partial shipment on a purchase order. When Starnet makes the final shipment on a purchase order and closes that

8
Case No.: 09-CV-04301-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1  purchase order permanently, Starnet uses a commercial invoice.  Thus, each type of invoice acts as

2  an independent bill, and Starnet calculates a customer's liability by adding the total prices listed on

3  both the proform and commercial invoices that it has sent to a customer.

4        In contrast, Peter Kafash testified at trial that a proform invoice does not represent a

5  shipment of goods.  According to Peter Kafash, a commercial invoice supersedes all proform

6  invoices that are associated with the same purchase order.  In other words, a buyer only receives

7  the goods listed on a commercial invoice and is thus only liable for the total price listed on the

8  commercial invoice.

9        If the Court were to decide the issue based on witness testimony alone, the Court would be

10  inclined to agree with Miller.  Miller is a credible witness who possesses direct knowledge of

11  Starnet's accounting practices and procedures.  His understanding of Starnet's uses of proform and

12  commercial invoices is likely more accurate than Peter Kafash's understanding as a customer.

13        Nevertheless, the Court finds that the proform and commercial invoices provided to the

14  Court raise three reasons to question Miller's view.  First, several standard differences between

15  Starnet's proform invoices and Starnet's commercial invoices give the impression that the proform

16  invoice does not represent a shipment of goods.  The most significant difference is that while all

17  three of the commercial invoices contained in Plaintiff's exhibits list a ship date and a vessel name,

18  *see* P.'s Exs. 6, 8, 11, 17,[8] none of the three proform invoices contain this information, *see* P.'s

19  Exs. 4, 5, 14.  The second significant difference is that while all three of the commercial invoices

20  list both a specific origin and a specific destination for the listed goods, the proform invoices only

21  indicate an origin.  Finally, all three of the commercial invoices state: "Payment by TT;" the

22  proform invoices, in contrast, do not have this statement but state: "Payment 20% Deposit."  It

23  seems reasonable that Starnet would ask for a deposit before shipping goods and then request full

24  payment once the goods are shipped.  Thus, the fact that the proform invoices ask for a deposit, and

25  not for full payment, gives the impression that proform invoices issue before goods are shipped.

26  Added together, these readily apparent and consistent differences between Starnet's proform

---

[8] Plaintiff's Exhibits 6 and 8 appear to be copies of the same Commercial Invoice.  On closer inspection, it appears that some of the information at the bottom of Plaintiff's Exhibit 8, including the deduction of a $10,000 deposit from the $69,673.32 total, has been covered up.

9

Case No.: 09-CV-04301-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

invoices and Starnet's commercial invoices imply that the goods listed on a proform invoice have not been shipped to a buyer. Instead, it appears that All Cheer uses the proform invoice to tell the buyer how much fabric All Cheer is willing to ship and how much that fabric will cost the buyer. If the buyer finds the terms agreeable, it appears the buyer then pays the deposit and receives the commercial invoice when the goods actually ship.

The second reason to doubt Miller's view on proform invoices is that when a proform invoice and a commercial invoice share invoice numbers, the type of fabric, the quantity, and the price per yard listed on both invoices are substantially similar. Thus, if both types of invoices represent a shipment of goods, then Starnet is shipping its customers the same basic order twice within a relatively short time. The clearest example involves Proform Invoice No. K-100528-1, dated December 18, 2008, and Commercial Invoice No. K-100528, dated December 26, 2008. Proform Invoice No. K-100528-1 is for French Terry at a price of $1.65/yard: 18,000 yards of black and 14,500 yards of navy (a total of 32,500 yards). *See* P.'s Ex. 14. This makes for a total listed price of $53,625.00. *Id.* Commercial Invoice No. K-100528 is for 32,500 yards of Cotton SP French Terry at $1.65/yard. *See* P.'s Ex. 11. The Commercial Invoice shows a deposit of $10,000 has been paid and lists a final total price of $43,625.00 (the equivalent of $53,625 minus $10,000). *Id.* Furthermore, the fact that Proform Invoice No. K-100528-1 requested "Payment 20% Deposit" and that $10,000 is approximately 19% of $53,625.00 does not seem to be coincidence.[9] Although it is certainly possible that Bapaz Garments wanted the same shipment twice, the consistent similarities between the quantity, type, and price of goods listed on proform

---

[9] Starnet conceded at trial that the amounts shown on the invoices just described are not in contention. Nevertheless, this same overlap holds true for the proform invoices and commercial invoice at issue here. These are Proform Invoice No. K-100567, dated November 7, 2008, Proform Invoice No. K-100568, dated November 7, 2008, and Commercial Invoice No. K-100567/568, dated December 5, 2008. Proform Invoice No. K-100567 is for TTR Tropical at $1.46/yard: 25,000 yards of black and 15,000 yards of brown. P.'s Ex. 4. Proform Invoice No. K-100568 is for T/R Spandex Jersey at $0.97/yard: 5,000 yards of black and 3,000 yards of brown. P.'s Ex. 5. Commercial Invoice No. K-100567/568 lists two goods. P.'s Ex. 6. First, it lists "TTR 2WAY TROPICAL SLD" at $1.46/yard: 26,010.90 yards of black and 16,149 yards of brown. *See id.* Second, it lists "T/R SPANDEX JERSEY SOLID" at $0.97/yard: 5,096 yards of black and 3,275 yards of brown. *See id.* Commerical Invoice No. K-100567/568 also shows that a $10,000 deposit has been deducted from the total price. *See id.* Both Proform Invoice No. K-100567 and Proform Invoice No. K-100568 request a 20% deposit. *See* P.'s Exs. 4, 5. Ten-thousand is approximately 15% of the amounts listed on both invoices.

10

Case No.: 09-CV-04301-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

invoices and commercial invoices that share the same invoice number make it difficult to believe that each represents an independent shipment of goods.

At trial, Miller attempted to explain this overlap as coincidental. He said that customers often purchase the same quantity of a good from a single purchase order. Although plausible, Miller's explanation is unpersuasive. This is because not only do related invoices list substantially similar terms, but they each list the type and quantity of fabric that appears on the related purchase order. A purchase order looks, in simplified terms, as follows:

| BAPAZ GARMENTS | PURCHASE ORDER NO.   {###} |
| --- | --- |
|  | ORDER DATE   {YYY-MM-DD} |
|  | PURCHASE ORDER |
| VENDOR TO:<br><br>ALL CHEER INTERNATIONAL LIMITED<br><br>{ADDRESS}<br><br>ATTE: MR. HAWELL CHAN | SHIP TO: |
|  |  |
| ITEM NO./DESCRIPTION                                      QTY              PRICE              AMOUNT |  |
| {ITEM DESCRIPTION}<br><br>COLOR: {COLOR}                                                                                 {##,###} |  |

As explained previously, Miller claimed that proform invoices represent a partial shipment on a purchase order. It seems strange to think that a proform invoice listing the same quantity of fabric as is listed on the purchase order would constitute a partial shipment. For example, Purchase Order No. 1975, dated December 11, 2008, is an order for French Terry Cotton/Spandex: 18,000 yards of black and 14,500 yards of navy (32,500 yards total). P.'s Ex. 3. Proform Invoice No. K-100528-1 and Commercial Invoice No. K-100528, each marked with "PO#1975" or "PO NO:

11

Case No.: 09-CV-04301-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1975," list 32,500 yards of what appears to be "Cotton SP French Terry." *See* P.'s Exs. 11, 14.[10] If both the proform and commercial invoice each memorializes a shipment of goods, then a buyer ultimately receives double what the buyer lists on the purchase order. Even though it is possible that this is the case, the more logical conclusion is that the proform invoice is a preliminary statement memorializing the negotiated price and the commercial invoice is the statement memorializing the actual shipment of goods.

The third and final reason to doubt Miller's claim about proform invoices is that Starnet has provided bills of lading for two of the commercial invoices that it issued to Bapaz Garments but did not provide bills of lading for any of the proform invoices that it provided to the Court. Miller testified at trial that Plaintiff's Exhibit 13, a bill of lading, was the shipping document associated with Commercial Invoice No. K-100528. P.'s Ex. 11. Likewise, Plaintiff's Exhibit 9 is the bill of lading for the goods shown in Commercial Invoice No. K-100567/568. P.'s Ex. 6 (showing a shipment of 531 pieces, exactly the amount listed in Plaintiff's Exhibit 9). If proform invoices did memorialize the shipment of goods, it seems likely that at least one of the proform invoices provided to the Court would have a bill of lading definitively showing shipment.

Based on the evidence before the Court, the Court finds that Starnet has failed to meet its burden to prove by a preponderance of the evidence that proform invoices memorialize a shipment of goods and that Starnet shipped Bapaz Garments the goods listed on Proform Invoice No. K-100567 or Proform Invoice No. K-100568. Thus, Starnet has failed to prove by a preponderance of the evidence that Bapaz Garments owes Starnet $132,298.32. Because Peter Kafash admitted that Bapaz Garments received $69,673.32 worth of fabrics from Starnet and the trial exhibits support

---

[10] This comparison also works for the invoices associated with Purchase Order No. 6029 and Purchase Order No. 6030. Dated October 20, 2008, Purchase Order No. 6029 shows an order for TTR Tropical Solid: 25,000 yards of black and 15,000 yards of brown. *See* P.'s Ex. 1. Proform Invoice No. K-100567 is for TTR Tropical: 25,000 yards of black and 15,000 yards of brown. *See* P.'s Ex. 4. Commercial Invoice No. K-100567/568 lists, under "PO NO:#6029," "TTR 2WAY TROPICAL SLD": 26,010.90 yards of black and 16,149 yards of brown. *See* P.'s Ex. 6. Also dated October 20, 2008, Purchase Order No. 6030 is an order for T/R Spandex Jersey: 5,000 yards black and 3,000 yards brown. *See* P.'s Ex. 2. Proform Invoice No. K-100568 is T/R Spandex Jersey: 5,000 yards of black and 3,000 yards of brown. *See* P.'s Ex. 5. Commercial Invoice No. K-100567/568 lists, under "PO NO:#6030," "T/R SPANDEX JERSEY SOLID": 5,096 yards of black and 3,275 yards of brown. *See id.*

this admission, the Court finds that Starnet sold and delivered to Bapaz Garments goods valued at $69,673.32, not $132,298.32.

### E. What Payments Did Bapaz Garments Make to Starnet?

Starnet argued at trial that, beyond the $3,535.00 credit shown on the December 31, 2008 Statement of Account, Bapaz Garments had not made any payments towards the three invoices at issue here. Miller testified that he personally conducted the collection activity on the Mousa Kafash dba Bapaz Garments account. He claimed that individuals at Bapaz Garments told him that the money had been wired out and that Bapaz Garments had paid for all goods received from Starnet. Miller further testified that Bapaz Garments faxed him documents in response to his inquiries about Bapaz Garments' payments. *See* P.'s Exs. 19, 20, 21, 22, 23.

Peter Kafash testified that Bapaz Garments Corp. wired All Cheer International Limited a total of $69,673.32 as payment for the goods shipped under Commercial Invoice No. K-100567/568. As proof, Peter Kafash pointed to two pages from Bapaz Garments Corp.'s bank statement. *See* D.'s Ex. 209. The first page is part of a January 2009 bank statement from CapitalOne Bank. It shows a wire transfer withdrawal of $59,673.32 to "ALL CHEER INTERN ATIONAL LT." *See id.* The second page shows a $10,000 wire transfer withdrawal to "ALL CHEER INTERN ATIONAL LT." *See id.*

Starnet did not appear to dispute at trial that Bapaz Garments had attempted to pay the $69,673.32. Rather, Miller testified that Starnet never received the wire transfer payments because Bapaz Garments did not properly wire the money. According to Miller, wire transferring money to a bank requires use of the bank's swift number. A bank's swift number is an account number that identifies the bank for purposes of wiring money. Miller testified that if an individual wires money to an incorrect swift number, the money will initially be deducted from the individual's bank account only to be credited back at a later time. According to Miller, Bapaz Garments used an incorrect swift number for All Cheer International Limited's bank, and as a result, All Cheer never received the money. Miller pointed to a money transfer verification form as support for his testimony. The form, P.'s Ex. 19, shows an amount of $59,673.32 being sent by Bapaz Garments LLC to All Cheer International Ltd. on January 6, 2009. In the bottom right hand corner, the words

"SWIFT – CCBQHKAZ" appear. Miller testified that All Cheer International Limited's bank's swift number is CCBQHKAX. *See also* P.'s Ex. 17.

The evidence presented by both sides has its weaknesses. Despite Peter Kafash's testimony that the $69,673.32 that Bapaz Garments Corp. wired to All Cheer International Limited was never returned to Bapaz Garments Corp.'s bank account, it is somewhat suspicious that Peter Kafash failed to produce full bank statements for the Court's review. Miller's knowledge of All Cheer International Limited's swift numbers can also be questioned. Miller testified that All Cheer International Limited's bank's swift number, to which Bapaz Garments Corp. transferred money, *see* P.'s Ex. 22, is completely wrong, and that none of the entities owned by Starnet use such a swift number.[11] However, this swift number, WIHBHKHH, is identical to the number listed on two of the All Cheer International Limited invoices at issue in this case. *See* P.'s Exs. 4, 5.

Starnet bears the burden of proof to prove by a preponderance of the evidence that Mousa Kafash has not paid for the goods delivered.[12] The Court finds that Starnet has not met its burden of proof and has failed to show by a preponderance of the evidence that Mousa Kafash did not pay the $69,673.32.

## CONCLUSIONS OF LAW

The Court will address the legal principles controlling each of Starnet's causes of action[13] and will apply those principles to the Court's above findings of fact.

**A. Open Book Account**

A book account is "a detailed statement of debit/credit transactions kept by a creditor in the regular course of business, and in a reasonably permanent manner." *Imperial Merch. Servs., Inc. v. Hunt*, 47 Cal. 4th 381, 397, 97 Cal. Rptr. 3d 464, 476, 212 P.3d 736, 746 (2009) (quoting *Reigelsperger v. Siller*, 40 Cal. 4th 574, 579 n.5, 53 Cal. Rptr. 3d 887, 150 P.3d 764 (2007))

---

[11] The invoice number on this document does not match the invoices at issue here.
[12] As outlined in the Court's conclusions of law below, a defendant's non-payment for goods received is an element of a claim for the reasonable value of goods sold and delivered.
[13] California law controls here. *See Goldberg v. Pac. Indem. Co.*, 627 F.3d 752, 755 (9th Cir. 2010) ("Under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), federal courts are to apply state substantive law and federal procedural law to diversity cases.").

(quotation marks omitted).[14]  A book account is open when there is a balance due on the account. *See Interstate Grp. Adm'rs, Inc. v. Cravens, Dargan & Co.*, 174 Cal. App. 3d 700, 708, 220 Cal. Rptr. 250 (1985).  In California, a book account may furnish the basis for a cause of action "when it contains a statement of the debits and credits of the transactions involved completely enough to supply evidence from which it can be reasonably determined what amount is due to the claimant." *Id.* (quoting *Tillson v. Peters*, 41 Cal. App. 2d 671, 678, 107 P.2d 434 (1940)) (quotation marks omitted).  To sustain a cause of action the book account must also show against whom the charges are made and in whose favor the charges run.  *See id.* (quoting *Joslin v. Gertz*, 155 Cal. App. 2d 62, 65, 317 P.2d 155 (1957)).

"Whether a book account exists between parties is a question of fact." *Cochran v. Rubens*, 42 Cal. App. 4th 481, 485, 49 Cal. Rptr. 2d 672 (1996) (citations omitted).  "Further, whether a book account is open or closed is a question of fact." *Id.*  The correctness of a book account is also a question of fact.  *See Thompson v. Machado*, 78 Cal. App. 2d 870, 874, 178 P.2d 838 (1947) ("As for the correctness of the account, that was a matter of fact for the trial court . . . .").  "[M]ore proof of correctness should be required when the creditor relies on his own books than where he relies on the regularly kept books of the debtor." *Richmond v. Frederick*, 116 Cal. App. 2d 541, 548, 253 P.2d 977 (1953).

"In deciding whether a book account exists the court must examine the agreement, or lack of agreement, between the parties and their conduct in the context of their commercial dealing.  The mere incidental keeping of accounts does not alone create a book account." *Maggio, Inc. v. Neal*, 196 Cal. App. 3d 745, 752, 241 Cal. Rptr. 883 (1987) (citation omitted).  "The law does not prescribe any standard of bookkeeping practice which all must follow, regardless of the nature of the business of which the record is kept." *Warda v. Schmidt*, 146 Cal. App. 2d 234, 238, 303 P.2d

---

[14] A more exhaustive definition is found in the California Code of Civil Procedure: "The term 'book account' means a detailed statement which constitutes the principal record of one or more transactions between a debtor and a creditor arising out of a contract or some fiduciary relation, and shows the debits and credits in connection therewith, and against whom and in favor of whom entries are made, is entered in the regular course of business as conducted by such creditor or fiduciary, and is kept in a reasonably permanent form and manner and is (1) in a bound book, or (2) on a sheet or sheets fastened in a book or to backing but detachable therefrom, or (3) on a card or cards of a permanent character, or is kept in any other reasonably permanent form and manner." CAL. CIV. PROC. CODE § 337a.

15

Case No.: 09-CV-04301-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

762 (1956). "[I]t makes no difference whether the account is kept in one book or several so long as they are permanent records, and constitute a system of bookkeeping as distinguished from mere private memoranda." *Id.* (citation omitted). Nevertheless, "[i]t must have been kept in the ordinary course of business." *Id.* (citation omitted).

Here, the Court found that Starnet did keep a file for the Mousa Kafash dba Bapaz Garments account. In this file, Starnet kept permanent records in the ordinary course of business detailing the goods that Starnet had shipped to Bapaz Garments and statements of account outlining the debits and credits on the Mousa Kafash dba Bapaz Garments account. The Court also found, however, that the December 31, 2008 Statement of Account, P.'s Ex. 7, listed incorrect charges. As outlined above, Invoice No. K-100567 and Invoice No. K-100568, P.'s Exs. 4, 5, are proform invoices that do not represent the actual shipment of goods. Without providing the Court an accurate statement of the amount due on the Mousa Kafash dba Bapaz Garments account, Starnet failed to supply sufficient evidence from which the Court could reasonably determine the amount due on the account. Therefore, Starnet's Book Account claim fails.

### B. Account Stated

"An account stated is an agreement, based on prior transactions between the parties, that the items of an account are true and that the balance struck is due and owing." *Maggio*, 196 Cal. App. 3d at 752, 241 Cal. Rptr. 883 (citation omitted). "An account stated need not cover all the dealings or claims between the parties. There may be a partial settlement and account stated as to some of the transactions." *Gleason v. Klamer*, 103 Cal. App. 3d 782, 790 (1980) (citing *Cal. Milling Corp. v. White*, 229 Cal. App. 2d 469, 477, 40 Cal. Rptr. 301 (1964)).

There are three essential elements of a claim for account stated: "(1) previous transactions between the parties establishing the relationship of debtor and creditor; (2) an agreement between the parties, express or implied, on the amount due from the debtor to the creditor; (3) a promise by the debtor, express or implied, to pay the amount due." *Zinn v. Fred R. Bright Co.*, 271 Cal. App. 2d 597, 600, 76 Cal. Rptr. 663, 665-66 (1969).

"The key element in every context is agreement on the final balance due." *Maggio*, 196 Cal. App. 3d at 753, 241 Cal. Rptr. 883 (citing 1 WITKIN, SUMMARY OF CALIFORNIA LAW,

16
Case No.: 09-CV-04301-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Contracts* § 917, p. 820 (9th ed. 1987)). "In the usual situation, it comes about by the creditor rendering a statement of the account to the debtor. If the debtor fails to object to the statement within a reasonable time, the law implies his agreement that the account is correct as rendered." *Zinn*, 271 Cal. App. 2d at 600, 76 Cal. Rptr. 663; *see also Maggio*, 196 Cal. App. at 753, 241 Cal. Rptr. 883 ("When a statement is rendered to a debtor and no reply is made in a reasonable time, the law implies an agreement that the account is correct as rendered.") (citations omitted). "Accordingly an account fails to become stated when the essential element of assent is lacking; and assent is not present when proper objections are made by the party sought to be charged." *Hansen v. Fresno Jersey Farm Dairy Co.*, 220 Cal. 402, 408, 31 P.2d 359 (1934) (citation omitted).

It is the creditor's burden to prove that an alleged debt is an account stated. *See Maggio, Inc. v. Neal*, 196 Cal. App. 3d 745, 753, 241 Cal. Rptr. 883 (1987) ("Our conclusion is simply another way of saying that [the creditor] did not satisfy its burden of proving [the debtor's] debt was an account stated."). Whether an alleged debt is an account stated is a question of fact. *See Fogarty v. McGuire*, 170 Cal. App. 2d 405, 409, 338 P.2d 992 (1959) ("Whether these conditions exist is usually a question to be determined by the trier of fact from all the circumstances of the case, and in reaching that determination reasonable inferences can be drawn in support of the claim of either party if there is any credible evidence warranting such action.") (citations omitted).

Here, the Court found that Mousa Kafash never agreed that he or Bapaz Garments owed Starnet any amount and disputed, from the beginning of Starnet's collection activities, the amount Starnet contended was due. *See* Exs. 19, 20, 21, 22, 23. Indeed, Peter Kafash maintained that Bapaz Garments had paid Starnet for all goods received. Because Starnet failed to carry its burden to prove that Mousa Kafash agreed that any balance was due on his account, the key element of an account stated claim, Starnet's claim fails.

### C. Reasonable Value of Goods Sold and Delivered

California recognizes a "common count[15] of quantum valebant for the reasonable value of goods sold and delivered." *Weitzenkorn v. Lesser*, 40 Cal. 2d 778, 792, 256 P.2d 947, 958 (1953).

---

[15] "A common count is not a specific cause of action . . . ; rather, it is a simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness . . . ." *McBride v. Boughton*, 123 Cal. App. 4th 379, 394, 20 Cal. Rptr. 3d 115, 127 (2004) (citations omitted).

Quantum valebant is a type of quasi-contract action. *See Jogani v. Superior Court*, 165 Cal. App. 4th 901, 905-06, 81 Cal. Rptr. 3d 503 (2008); *see also* 4 WITKIN, CALIFORNIA PROCEDURE § 567 (5th ed. 2008) ("The count on quantum valebant is similar to that on quantum meruit, except that it seeks recovery of the reasonable value of goods sold.") (internal citations omitted). "Quasi-contracts, unlike true contracts, are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises." *Weitzenkorn*, 40 Cal. 2d at 794, 256 P.2d at 959 (quotation omitted). "They are obligations created by law for reasons of justice." *Id.* (quotation omitted).

"The theory of quasi-contractual recovery is that one party has accepted and retained a benefit with full appreciation of the facts, under circumstances making it inequitable for him to retain the benefit without payment of its reasonable value." *Day v. Alta Bates Med. Ctr.*, 98 Cal. App. 4th 243, 248, 119 Cal. Rptr. 2d 606, 609 (2002) (quoting *Truestone, Inc. v. Simi W. Indus. Park II*, 163 Cal. App. 3d 715, 724, 209 Cal. Rptr. 757 (1984)) (quotation marks omitted); *see also Weitzenkorn*, 40 Cal. 2d at 794, 256 P.2d at 959 ("Quasi contractual recovery is based upon benefit accepted or derived for which the law implies an obligation to pay. Where no benefit is accepted or derived there is nothing from which such contract can be implied.") (quoting *Rowell v. Crow*, 93 Cal. App. 2d 500, 503, 209 P.2d 149, 151 (1949)) (quotation marks omitted).[16]

According to the Judicial Council of California Advisory Committee on Civil Jury Instructions, a plaintiff must prove four elements to recover on a claim for goods delivered: (1) that defendant requested, by words or conduct, that plaintiff deliver goods for defendant's benefit; (2) that plaintiff delivered the goods as requested; (3) that defendant has not paid plaintiff for the goods; and (4) the reasonable value of the goods that were provided. JUDICIAL COUNCIL OF CAL. CIV. JURY INSTRUCTION No. 371 (2010). Thus, a defendant's non-payment for goods received is an essential element of a claim for goods delivered. *See* 1-9 MB Practice Guide: CA Contract Litigation 9.26 (listing what the plaintiff must establish in order to sustain a quantum valebant

---

[16] This claim can also be characterized as an unjust enrichment claim. "[T]he elements for a claim of unjust enrichment [are] receipt of a benefit and unjust retention of the benefit at the expense of another." *Lectrodryer v. Seoulbank*, 77 Cal. App. 4th 723, 726, 91 Cal. Rptr. 2d 881 (2000) (citing *First Nationwide Savings v. Perry*, 11 Cal. App. 4th 1657, 1662-63, 15 Cal. Rptr. 2d 173 (1992)).

claim, including that defendant did not pay for the goods received); *cf Weitzenkorn*, 40 Cal. 2d at 792, 256 P.2d 947 (finding that a claim for the reasonable value of goods sold and delivered includes a defendant's refusal to pay); *Farmers Ins. Exch. v. Zerin*, 53 Cal. App. 4th 445, 460, 61 Cal. Rptr. 2d 707 (1997) (holding that one of the essential allegations of a common count is nonpayment).

As outlined in the Court's findings of fact, neither Mousa Kafash nor Bapaz Garments received the goods listed on Proform Invoices K-100567 and K-100568 (P.'s Exs. 4, 5). Bapaz Garments did, however, receive the goods listed on Commercial Invoice K-100567/568, P.'s Ex. 6, and did not dispute that their reasonable value was $69,673.32, the amount shown on the invoice. Nevertheless, because Starnet failed to prove by a preponderance of the evidence that Mousa Kafash did not pay $69,673.23 for the goods he received, Starnet's claim for the reasonable value of goods and services fails.

### D. Undisclosed Principal

Because the Court finds that Starnet has not proven any of its claims, it need not address whether Mosua Kafash was an agent of an undisclosed principal. Nevertheless, the Court notes that if it had to reach the issue, it would likely find that Mousa Kafash is not such an agent. According to several California Courts of Appeal, "[t]he rule is well established that, where one deals with another believing him to be a principal, and subsequently learns that he was dealing with an agent of an undisclosed principal, he may recover either from the person with whom he dealt or from the undisclosed principal." *J & J Builders Supply v. Caffin*, 248 Cal. App. 2d 292, 295, 56 Cal. Rptr. 365 (1967) (quotation and quotation marks omitted); *see also Carlesimo v. Schwebel*, 87 Cal. App. 2d 482, 486, 197 P.2d 167 (1948); *Grosso v. Monfalcone, Inc.*, 13 Cal. App. 2d 405, 56 P.2d 1266 (1936); *Rigney v. De La Salle Inst.*, 10 Cal. App. 2d 492, 496, 52 P.2d 579 (1935).

It appears that under California law, the agent has the burden of showing that it disclosed the identity of the principal. "If a person would excuse himself from responsibility on the ground of agency, he must show that he disclosed his principal at the time of making the contract, and that he [the agent] accepted on his [the principal's] behalf, so as to enable the party with whom he deals to have recourse to the principal in case the agent had authority to bind him." *J & J Builders*, 248

1   Cal. App. 2d at 295, 56 Cal. Rptr. 365 (quotation and quotation marks omitted).  It does not,

2   however, appear that an agent must prove that the third-party knew of the identity of the principal.

3   Rather, a showing that the third-party should have known is sufficient.  According to one

4   California Court of Appeal, "[t]he true rule is that . . . the directors or officers are personally liable

5   unless the third person knew, or in the exercise of reasonable care should have known, that he was

6   dealing with a corporation."  *Carlesimo*, 87 Cal. App. 2d at 486, 197 P.2d 167.

7        Here, Mousa Kafash, as CEO of Bapaz Garments Corp., is an agent of Bapaz Garments

8   Corp.  Thus, if Mousa Kafash did business with Starnet without disclosing that he was an agent of

9   Bapaz Garments Corp., Starnet may seek to recover from Mousa Kafash.  However, the Court

10  finds that even though Starnet did not know that Bapaz Garments was a corporation, Starnet has

11  not proven by a preponderance of the evidence that Mousa Kafash and not Peter Kafash did

12  business with Starnet.  Starnet's sole witness, Kurt Miller, testified that he only interacted with

13  Mousa Kafash to collect the alleged debt.  Starnet provided no evidence that anyone at Starnet

14  spoke with Mousa Kafash during the purchasing process.  In addition, Starnet did not provide

15  testimony as to how the account file bearing Mousa Kafash's name was created.  Miller testified

16  that the Mousa Kafash account was created before Miller started working at Starnet.

## CONCLUSION

For the foregoing reasons, the Court finds in favor of Defendant and against Plaintiff on all three of Plaintiff's causes of action.  Therefore, Plaintiff's requests for relief are DENIED.  The Clerk shall enter judgment for Defendant.

**IT IS SO ORDERED.**

Dated: March 8, 2011

*Lucy H. Koh*
LUCY H. KOH
United States District Judge